Michael E Zeliger (SBN 271118)
michael.zeliger@klgates.com
Ranjini Acharya (SBN 290877)
ranjini.acharya@klgates.com
Jerrold F. Petruzzelli (SBN 77748)
jerry.petruzzelli@klgates.com
K&L GATES LLP
630 Hansen Way
Palo Alto, CA  94304
Telephone: +1 650 798 6700
Facsimile: +1 650 798 6701


Attorneys for Plaintiff
SONOMA PHARMACEUTICALS, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| SONOMA PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> COLLIDION, INC., HOJABR (HOJI) ALIMI, SAMEER HARISH, ANTOINETTE DOUGLAS, MONICA SHAFFER, and DOES 1 to 10, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** <br><br> 1. **MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT ("DTSA") 18 U.S.C. § 1836; AND** <br> 2. **BREACH OF FIDUCIARY DUTIES** <br><br> Trial Date: None Set |

Plaintiff Sonoma Pharmaceuticals, Inc. f/k/a Oculus Innovative Sciences ("Plaintiff" or "Sonoma"), by and through its undersigned attorneys, alleges against Defendants Collidion, Inc., Sameer Harish, Hojabr (Hoji) Alimi, Antoinette Douglas, and Monica Shaffer (collectively "Defendants," and each a "Defendant") as follows:

### NATURE OF THE ACTION

1.      This action arises under the Defend Trade Secrets Act ("DTSA"), from Defendants' calculated misappropriation and use of Sonoma's confidential, proprietary and trade secret information unfairly to compete with Sonoma in the United States.

2.      This Court should not allow Defendants to enjoy the significant economic and market benefits that are certain to result from these illicit activities.

3.      Sonoma seeks injunctive relief as well as damages to address the harms caused by Defendants' illegal activities.

### PARTIES

4.      Plaintiff Sonoma Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business at 1129 North McDowell Blvd. Petaluma, CA 94954.  Plaintiff formally changed its name from Oculus Innovative Sciences, Inc. in 2016.

5.      Defendant Collidion, Inc. ("Collidion") is a Nevada corporation with principal place of business at 1356 Gordon Lane, Santa Rosa, CA 95404.  Upon information and belief, Collidion can be served through its registered agent for service of process, Lynne Bolduc, located at 16148 Sand Canyon Avenue, Irvine, CA 92618.

6.      Upon information and belief, Hojabr (Hoji) Alimi ("Alimi") is an individual residing in Santa Rosa, California.

7.      Upon information and belief, Antoinette Douglas ("Douglas") is an individual residing in Fairfield, California.

8.      Upon information and belief, Sameer Harish ("Harish") is an individual residing in Walnut Creek, California.

9.      Upon information and belief, Monica Shaffer ("Shaffer") is an individual residing in Sebastopol, California.

10.     Sonoma is ignorant of the true names and capacities of the remaining defendants, sued as Does 1 through 10, and therefore sue defendants by such fictitious names.  Sonoma will amend this Complaint to allege true names and capacities when ascertained.  Sonoma is informed and believes, and on that basis alleges, that each of the fictitiously named defendants are in some manner responsible for the harm Sonoma has incurred and will incur if injunctive relief is not allowed or damages are not awarded.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as Sonoma asserts a claim for misappropriation of trade secrets under the DTSA, 18 U.S.C. §1836, as amended.

12.     This Court has supplemental or pendant jurisdiction over Sonoma's remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so related to Sonoma's federal misappropriation of trade secrets claim that they form part of the same case or controversy under Article III of the United States Constitution.

13.     This Court has personal jurisdiction over Defendants Alimi, Douglas, Harish, and Shaffer because they are residents of this District and have committed acts giving rise to liability within this District and the State of California.

14.     This Court has personal jurisdiction over Defendant Collidion because Collidion operates a business in the State of California, has an office for the transaction of business in the State of California, has registered to do business in the State of California, and has committed acts giving rise to liability within the State of California.

15.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this dispute and the damages sustained in this dispute have occurred, and are occurring, within this District.

## FACTUAL BACKGROUND
### Sonoma's Business Activities

16.     Sonoma is a specialty pharmaceutical company that develops and markets unique and effective solutions for the treatment of dermatological conditions and advanced tissue care.

17.     Sonoma's dermatological and advanced skin care products are sold throughout the United States and internationally.  Sonoma's products have improved outcomes for more than five million patients globally by reducing infections, itch, pain, scarring and harmful inflammatory responses to medical procedures and various medical afflictions.

18.     Sonoma's success in a competitive market is dependent upon its ability to develop products that are innovative and meet the demands of its customers.  Sonoma has therefore invested significant time, effort, and money into research and development, particularly with respect to the driving safe and effective healthcare products, treatments, and medicines to market through the development and acquisition of innovative technologies.

19.     Sonoma's ability to achieve success in this competitive market hinges on its ability to protect its confidential, proprietary, and trade secret information from public disclosure.

20.     As just one example, Sonoma is the market leader in the development of wound care agents that incorporate hypochlorous acid.  Hypochlorous acid is a compound that is also produced by the human body's immune system upon demand to eradicate foreign pathogens in the body.

21.     Sonoma has dedicated many years of work to the perfection of its hypochlorous acid products, which became the foundation for Sonoma's well-known Microcyn® range of products. Sonoma's Microcyn® technology was the very first hypochlorous acid introduced into the U.S. advanced wound care market.  The Microcyn® range of products continues to be one of the top-selling brands of hypochlorous acid-based wound care agents in the United States.

22.     Sonoma has continued to invest in developing new hypochlorous products since the first of its products was launched nearly 15 years ago.  For example, in August 2016, Sonoma announced that it had obtained Food and Drug Administration approval to begin marketing a new hypochlorous acid product for the removal of foreign material from the sites of dermal procedures.

23.     Much of the information regarding the development, testing, formulation, and methods of manufacturing Sonoma's products, including its hypochlorous acid products, continues to hold substantial commercial and competitive value.

24.     By way of example, Sonoma's gel-based hypochlorous acid products make use of a proprietary gelling agent, the composition of which is not known or disclosed to any third parties, and is part of the information that Sonoma considers its trade secrets.

25.     Sonoma discloses certain aspects of the methods of manufacture for its hypochlorous acid-based products as part of the disclosure of inventions for which Sonoma has sought—and obtained—patent protection.

26.     Sonoma otherwise strictly maintains the confidentiality of much of the information for its products, including formulation information, batch records, operations manuals, and analytical methods, which are used as part of Sonoma's efforts to achieve regulatory compliance and to ensure the safety and efficacy of its products.  This information is highly confidential in nature, is not disclosed in Sonoma's patent applications, and is part of the information that Sonoma considers its trade secrets.

27.     Sonoma also keeps confidential certain business information relating to its vendors, and its customer lists.

**Sonoma's Protection of Its Confidential, Proprietary, and Trade Secret Information**

28.     Sonoma takes the protection of this proprietary information seriously, and has taken diligent and reasonable steps to protect its proprietary information from disclosure or use by third parties, unless such third parties are subject to protective provisions restricting disclosure or further use of same unless in furtherance of Sonoma's interests.  These measures include, by way of example, strict limitations on the dissemination of information on a need-to-know basis, the use of employee confidentiality agreements, the use of non-disclosure agreements with third parties, and the deployment of multiple layers of password-only access to its databases.

29.     Internally, Sonoma protects its proprietary information by requiring its employees to execute an assignment of inventions and confidentiality agreement. ("Confidentiality Agreement"). A standard copy of the Confidentiality Agreement (as signed by Defendant Douglas) is attached hereto as **Exhibit A**.

30.     Sonoma's Confidentiality Agreement exists to protect Sonoma's highly sensitive confidential trade secrets from public disclosure.  Each employee agrees therein "at all times during

the term of [my] employment and thereafter, to hold *strictest confidence,* and not to use, except for the benefit of the Company, or to disclose to any person, form [sic] or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company." *See* **Exhibit A**, ¶ 2.  This obligation's importance is underscored by the Confidentiality Agreement's prohibition that the signatory employee has no right to use the Confidential Information after employment for any purpose: "I understand that nothing in this Agreement conveys to me a personal license to the Company's Confidential Information. I understand that upon the termination of my employment with the Company I will have no rights to use the Company's Confidential information for any purpose." *Id.*

31.     When an employee is terminated or voluntarily discontinues employment with Sonoma, that employee is required to return all Sonoma items in his or her possession.  Specifically, under section 5 of the standard Confidentiality Agreement, each employee covenants as follows. "I agree that at the time of leaving the employ of the Company I will deliver to the Company (and will not keep in my possession, recreate, or deliver to anyone else) any and all devices, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company of [sic] otherwise belonging to the Company, its successors or assigns. In the event of the termination of my employment, I agree to sign and deliver the 'Terminations Certification' attached hereto…" *See* **Exhibit A**, ¶ 5.

32.     Further steps taken by Sonoma to ensure that its information is protected when an employee departs or is terminated include changing critical passwords for its systems and databases, and wiping access cards.

33.     Sonoma maintains an employee handbook outlining its policies and guidelines for employees dealing with Sonoma's electronic data and sensitive business information, which employees are required to review and acknowledge as part of their employment.

34.     Sonoma's physical facilities are monitored, and individuals can only gain access to Sonoma's facilities by using a coded access card.

**COMPLAINT**

35.     Sonoma's most sensitive confidential proprietary and trade secret information, including its correspondence with the FDA and other regulatory bodies that discloses formulation information, batch records, operations manuals, and analytical methods for Sonoma's products, is stored on a secure physical server.

36.     Physical access to Sonoma's internal computer server, on which its most confidential information for submission to regulatory authorities is stored, is through a locked room containing no other hardware equipment, limited to very few personnel.  Remote access to this highly confidential information on the server is also limited: the server drive is only accessible by high-level employees who are responsible for regulatory affairs, and those employees are required to successfully navigate password prompts before being able to access the confidential information.

**The Relationship Between Sonoma and Defendants Alimi, Douglas, Harish, and Shaffer**

37.     Alimi served continuously as Sonoma's Chief Executive Officer from 1999 until February 2013.  At all times prior to 2013, Alimi was also the President of Sonoma.  Alimi also continuously served as Chairman and a member of Sonoma's Board of Directors from 1999 to early 2014.

38.     On March 21, 2013, Alimi stepped down as Sonoma's President, remaining as Sonoma's CEO, and became the CEO of Sonoma's former subsidiary, Ruthigen, Inc. ("Ruthigen").

39.     Sonoma and Ruthigen entered into a Shared Services Agreement ("SSA") to share employees and facilities, meaning that Ruthigen's employees worked at the same facility, and had access to certain of Sonoma's confidential information, including information relating to formulation information, batch records, operations manuals, and analytical methods for Sonoma's products, which Ruthigen's employees also had a duty to guard.

40.     Sonoma and Ruthigen also entered into a License and Supply Agreement ("LSA") effective May 22, 2013.  A copy of the LSA is attached hereto as **Exhibit B**.  By the terms of that LSA, Sonoma shared certain of its proprietary technology and know-how relating to the manufacture of a unique and proprietary chemical formulation with Ruthigen, to allow Ruthigen to develop and commercial products utilizing Sonoma's proprietary technology and knowhow for certain applications.  *See* **Exhibit B**, Recitals.

41.     The LSA included an obligation for each party to protect the other party's confidential information and know-how, shared under the LSA, from unauthorized disclosure. *See* **Exhibit B**, § 10.1 ("the Parties agree that the receiving Party shall keep confidential and shall not publish or otherwise disclose or use for any purpose other than as provided for in this Agreement any Know-how and other information and materials furnished to it by the other Party or the other Party's Affiliates or sub-licensees pursuant to this Agreement, or any provisions of this Agreement that are the subject of an effective order of the Securities Exchange Commission granting confidential treatment pursuant to the Exchange Act of 1934 as amended (collectively "Confidential Information"), except to the extent that it can be established by the receiving Party that such Confidential Information"). These obligations extended beyond the termination of the LSA. *See, e.g., id*., § 14.3.

42.     Ruthigen became a public corporation on or about March 26, 2014 and remained as an independent entity until it merged with Pulmatrix Inc. in June 2015.

43.     At the time of the Pulmatrix merger, Alimi stepped down as Ruthigen's CEO.

44.     During his tenure at Sonoma, Alimi directed and had overall responsibility for Sonoma's overall business plans and operations. In particular, Alimi directed the development of Sonoma's hypochlorous acid products, and oversaw bringing of these products to market. Alimi was knowledgeable in fine detail about, and responsible for, all of Sonoma's operations, activities, and all its expenditures.

45.     As a result of his duties at Sonoma, Alimi had substantial access to all of Sonoma's proprietary, confidential, and trade secret information.

46.     As a result of his roles as CEO, President, and Board Member of Sonoma, Alimi owed the highest unqualified fiduciary duty to Sonoma. As such, Alimi was and is required to abide by the highest standards with regard to handling and use of Sonoma's proprietary, confidential, and trade secret information.

47.     As Sonoma's CEO, Alimi was aware of Sonoma's policy on having all employees execute its Confidentiality Agreement. In fact, Alimi was responsible for ensuring that all employees, including himself, executed a Confidentiality Agreement as a condition of becoming an

1  employee and maintaining employment at Sonoma.  As Sonoma's employee, Alimi was subject to

2  the same requirement.  As its CEO, he was responsible for enforcing this requirement without

3  exception, for ensuring that adequate records were kept with respect thereto, and that all employees'

4  employment files, as required by law, contained a copy of such executed Confidentiality Agreement.

5        48.     Alimi, as founder of Sonoma, was Sonoma's first employee.  No Confidentiality

6  Agreement has been found in Alimi's company personnel file or elsewhere, despite Sonoma's

7  diligent efforts to locate the same.  On information and belief, Sonoma alleges that either Alimi did

8  not sign such a Confidentiality Agreement, in order to evade the obligations placed on all employees

9  by Sonoma, or in violation of his duties as a Sonoma fiduciary, Alimi destroyed his signed

10  Confidentiality Agreement.

11        49.     Sonoma employed Douglas as an integral member of the Sonoma team on July 17,

12  2008.  Douglas was employed by Sonoma as its Associate Director of Regulatory Affairs, and then

13  Director, Regulatory Affairs and Quality Assurance until February 1, 2013 when she transferred to

14  Ruthigen as Director of Regulatory Affairs and Quality Assurance.  As part of her duties at Sonoma

15  and then at Ruthigen, Douglas was responsible for regularly liaising with the FDA and other

16  government agencies regarding all of Sonoma's products.  Information submitted by Sonoma to the

17  FDA to comply with the Sonoma's regulatory disclosure obligations is highly confidential and has

18  substantial commercial value, insofar as the same bears on Sonoma's products' commercial viability,

19  its products' safety, and the company's financial performance.

20        50.     Douglas had access to, and knew, all of Sonoma's highly sensitive and confidential

21  trade secret information and had access to, and knew, every piece of research and development

22  information that Sonoma submitted to regulatory bodies.  Thus, Douglas had detailed knowledge and

23  access to all of the development, testing, formulations, and methods of manufacture information for

24  all of Sonoma's products and, in particular, its hypochlorous acid products.  Douglas signed

25  Sonoma's Confidentiality Agreement on or about July 7, 2008.

26

27

28

**COMPLAINT**

51.     Section 2(a) of the Confidentiality Agreement signed by Douglas states:

> I recognize that the employer-employee relationship is an inherently confidential relationship. I agree at all times during the term of my employment and thereafter, to hold in *strictest confidence,* and not to use, except for the benefit of the Company, or to disclose to any person, form or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company. I understand that "Confidential Information" means any Company proprietary information, data or trade secrets, including, but not limited to, patent applications, copyright application, submissions to the FDA and other regulatory agencies, purpose or executed agreements with third parties, marketing and other research, business plans, finances or other business information, strategic aims, product plans, products, services, customer lists and customers (including but not limited to customer of the Company on whom I called or with whom I became acquainted during the term of my employment), disclosed to me by the Company wither directly or indirectly in writing, orally or my drawing or observation, during my training and/or employment. I agree to never represent that the Company's Confidential Information is my personal property. I understand that nothing in this Agreement conveys to me a personal license to the Company's Confidential Information. I understand that upon the termination of my employment with the Company I will have no rights to use the Company's Confidential Information for any purpose. I further understand the Confidential Information does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

52.     "Company" is defined to include "Oculus Innovative Sciences, Inc., a Californian corporation, its *subsidiaries*, affiliates, successors or assigns." *See* **Exhibit A**, ¶ 1 (emphasis added). Ruthigen, which was Sonoma's wholly-owned subsidiary during the term of Douglas's employment, was covered by the terms of the Confidentiality Agreement that Douglas signed.

53.     Section 5 of the Confidentiality Agreement required Douglas to return Sonoma's documents at the time she left Sonoma's employment. *See* **Exhibit A**, ¶ 5. ("I agree that, at the time of leaving the employ of the Company I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company of otherwise belonging to the Company, its successors or assigns.  In the event of the termination of my employment, I agree to sign and deliver the "Terminations Certification" attached hereto…")

54.     By signing the Confidentiality Agreement, Douglas agreed to be bound by all of its terms.

55.     Harish was employed as the Chief Financial Officer of Sonoma's subsidiary, Ruthigen, on February 1, 2013.  At that time, pursuant to a shared services agreement between Ruthigen and Sonoma, Ruthigen employees and contractors shared the same facilities as Sonoma employees and had access to certain of Sonoma's confidential information.  As Ruthigen's CFO, Harish was privy to confidential and trade secret information of Ruthigen and Sonoma.

56.     Alimi, as CEO of Ruthigen, extended an offer of employment to Harish, who in turn agreed to and accepted the offer on February 1, 2013.  A copy of the fully executed offer of employment is attached hereto as **Exhibit C**.

57.     By signing the letter of employment, Harish agreed to be bound by the Confidential and Proprietary Information clause, which provides:

> The Company expects that you work all your business hours exclusively for Ruthigen, and that you will not directly or indirectly engage in any other employment, consulting or business activity elsewhere. This policy is further detailed in a certain Confidentiality Agreement, a copy of which is attached for your signature. The Company has a firm policy against its employees using any trade secrets or other proprietary information of third parties or previous employers in the course of performing their duties for the Company. This policy is set forth in a certain separate agreement entitled "Proprietary Information and Inventions Agreement," a copy of which is attached for your signature. During your employment with Ruthigen and with the Company, you may not disclose to the Company or use, or induce the Company to use, any trade secrets or other proprietary information of others, including your prior employers. By accepting employment with the Company, you agree that you will not, in the performance of your duties at the Company, utilize or disclose any proprietary information of former employers and that you will take with you no tangible items such as drawings or reports when you leave your current employer.

58.     By the terms of that letter, Harish's Ruthigen employment was contingent in part upon Harish signing the Sonoma Proprietary Information and Inventions Agreement (which, for purposes of such agreement, defined Company employees to include employees of its subsidiary Ruthigen) , attached to that letter.  *See* **Exhibit C**, at pp. 1-2.  No such signed agreement of this kind has been found in Harish's Sonoma personnel file, despite Sonoma's diligent search of its records.

59.     Shaffer was employed as Alimi's assistant at Ruthigen on March 6, 2013.  On information and belief, once Ruthigen became a public corporation in 2014, Shaffer's role expanded to include quality assurance activities for Ruthigen's products.  As part of her duties as assistant to the CEO, upon information and belief, Shaffer had detailed knowledge of Sonoma's operations, business development activities, vendor relationships, and customers.

60.     As part of their employment at Sonoma and/or Ruthigen, Defendants Harish, Shaffer, and Douglas had access to Sonoma's confidential business development activity information, vendor relationship information, customer lists, operating procedures, formulas, batch records, operations manuals and analytical methods used across all of Sonoma's product lines.

61.     Alimi founded Collidion in 2015.  Upon information and belief, Douglas, Harish, and Shaffer began to work for Collidion as employees or consultants shortly thereafter.

**Defendants Alimi, Douglas, Harish, and Shaffer Have Knowingly Misappropriated Sonoma's
Confidential, Proprietary, and Trade Secret Information**

62.     Defendants are well aware that Sonoma uses a proprietary gelling agent in all of its products, which Sonoma obtains from a third-party vendor.  Defendants are also aware that no other party has any right of access to, or use of, Sonoma's proprietary gelling agent.

63.     However, in April 2016, upon information and belief, Sonoma learned that Shaffer, at Alimi's explicit direction, sought to order Sonoma's proprietary gelling agents from Sonoma's third-party vendor.

64.     Sonoma considered such conduct a breach of Alimi and Shaffer's obligation to keep Sonoma's confidential information secret, and was alarmed by this misuse of Sonoma's confidential, proprietary, and trade secret information, and efforts to profit from the same.

65.     Concerned by these actions, Sonoma caused a letter to be sent to Collidion's Board of Directors.  A copy of that letter, dated April 12, 2016, is attached hereto as **Exhibit D**.  In that letter, Sonoma sought, in part, assurances from Collidion's Board that both Collidion and Alimi would cease any further attempt to misappropriate and/or use Sonoma's confidential, proprietary, and/or trade secret information, and refrain from basing their future endeavors upon Sonoma's trade secrets.

66.     Collidion responded on April 29, 2016 and refused to provide Sonoma with any such assurances.  *See* **Exhibit E**.  Faced with Collidion's truculence, and lacking any means, short of then available proof that would warrant formal litigation, by which to verify whether Alimi was engaging further in anti-competitive behavior, Sonoma did not pursue the matter.

67.     Then, on January 16, 2017, Sonoma received a letter purportedly written by Defendant Harish, a copy of which is attached as **Exhibit F**.  That letter appeared to provide proof that Sonoma's concerns described in its April 12, 2016 letter, were justified.  In that letter, Harish purportedly alleged that "Collidion intends to work on Hypochlorous Acid products and directly and indirectly compete with [Sonoma].  The subsidiary that will do so is going to be known as Avenlogics Inc."

68.     Sonoma was further informed by **Exhibit F** that Defendants Alimi, Douglas, Harish, and Shaffer allegedly knowingly and "*systematically copied all of [Sonoma's] trade secrets including Standard Operating Procedures, Formulas, Batch Records, Operations Manuals and Analytical Methods and are currently using these as a basis for starting up operations at the Santa Rosa facility.*"  *See* **Exhibit F** (emphasis added).

69.     Sonoma subsequently attempted several times by telephone to contact Harish to: (i) verify that he is indeed the author of the letter attached as **Exhibit F**; and (ii) confirm the letter's allegations.  To date, Harish has not responded.

70.     Sonoma also reached out to Douglas to attempt to verify the allegations in the letter attached as **Exhibit F**.  Sonoma was able to speak with Douglas on two occasions in February 2017, after being informed by Douglas at the outset that she was no longer a Collidion employee.  However, Douglas was not able to confirm whether the allegations in the letter are true or false.

71.     The allegations in the letter have led Sonoma reasonably to believe that all Defendants have in fact misappropriated Sonoma's confidential, proprietary and trade secret information by, *inter alia*, systematically copying Sonoma's standard operating procedures, formulas, batch records, operations manuals and analytical methods used across all of Sonoma's product lines.

**Defendants' Actions Indicate Misuse of Sonoma's Misappropriated Trade Secrets**

72.     Based on the allegations in the letter attached at **Exhibit F**, Sonoma further believes that Defendants intend to misuse the confidential and trade secret information that they unlawfully misappropriated from Sonoma.

73.     As described in **Exhibit F**, Defendants have allegedly purchased the exact same analytical and production equipment used by Sonoma, based on the information that Alimi, Douglas, Harish, and Shaffer misappropriated from Sonoma.  As further described in **Exhibit F**, Defendants allegedly are intending to use this equipment to make use of the confidential operating procedures, formulas, batch records, operations manuals and analytical methods that are used by Sonoma, to achieve state-level (and then eventually federal level) approvals for products previously developed by and proprietary to Sonoma, which directly compete with Sonoma's hypochlorous acid-based products.  As also described in **Exhibit F**, these files are currently being held in cloud-based applications.

74.     On January 21, 2017, Sonoma received a copy of Collidion's presentation to prospective investors in connection with Collidion's $10mm Series A Preferred Stock Offering.  A copy of that presentation is attached hereto as **Exhibit G**.

75.     Collidion's presentation states Collidion's intention to enter the drug and medical device market, and specifically, the hypochlorous acid market.  Collidion's presentation declares that it is raising investor funds to implement its intention.

76.     For example, Collidion identifies Avenlogic, Inc. as a Collidion subsidiary that will be the "disruptive antimicrobial products platform."  *See* **Exhibit G**, at 6.

77.     Collidion also identifies hypochlorous acid as "nature's defense against infection," and describes it as "***Our*** Active Ingredient."  *See* **Exhibit G**, at 10 (emphasis added).  Collidion then provides an analysis of reasons why to pursue the disinfectant market (*id.,* at 19-20); timelines for Collidion's entry into the disinfectant market (*id.,* at 22); and its business strategy for addressable markets for hypochlorous acid-based products (*id.,* at 23-29).

78.     It took Sonoma tens of millions of dollars and many years of development using its confidential information and trade secrets to achieve success in the antiseptic/disinfectant markets

which rely on hypochlorous acid-based products.  According to Collidion's presentation, Collidion intends to succeed in the market in far less time and using far less money and investing far fewer resources into research and development than that invested by Sonoma.  This cannot and would not be possible without the Defendants' misappropriation of Sonoma's confidential information and trade secrets.

79.     Collidion underscores the interconnectedness of the activities that Alimi knew of, directed, and participated in at Sonoma, and the activities that Alimi is undertaking at Collidion.  For example, Collidion outlines Alimi's alleged contributions while at Sonoma, including a claim that between 2002 and 2005, "After >3 years of R&D, Hoji [Alimi] stabilize[d] the target pH neutral [hypochlorous acid] with a 2-year shelf-life under ambient temperatures. For the first time, the product could be bottled and shipped around the world." *See* **Exhibit G**, at 14.

80.     Collidion also identifies certain milestones achieved by Sonoma (identified by its former name, Oculus Innovative Sciences), and implicitly suggests that Alimi was responsible for achieving those milestones:



*See* **Exhibit G**, at 15.

**COMPLAINT**

81.    Collidion explicitly describes Alimi's "Road to Collidion, Inc." and highlights the dates that Alimi's ostensible non-compete agreements with Sonoma and Pulmatrix are set to expire as "roadblocks" to the building of Collidion's manufacturing plant and operations in connection with the production of hypochlorous acid-based products:



*See* **Exhibit G**, at 18.

82.    The information in **Exhibit F** and **Exhibit G** has led Sonoma to believe that Defendants have misappropriated Sonoma's confidential, proprietary and trade secret information contained in the standard operating procedures, formulas, batch records, operations manuals and analytical methods, and are using and are intending to disclose and use the same to compete unfairly with Sonoma.

# FIRST CAUSE OF ACTION

### Misappropriation of Trade Secrets Under 18 U.S.C. § 1836, *et seq.*

83.     Sonoma incorporates by reference and realleges the allegations in paragraph 1 - 80 as if fully set forth herein.

84.     Sonoma owns and possesses certain confidential, proprietary and trade secret information, as alleged above.

85.     This confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

86.     Sonoma has taken reasonable measures to keep such information secret and confidential.

87.     This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

88.     In violation of Sonoma's rights, Defendants have misappropriated the confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein.

89.     Defendants' misappropriation of the confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

90.     Defendants failed to return Sonoma's confidential and trade secret information as required under their employment obligations.

91.     On information and belief, Defendants are intending to use Sonoma's confidential and trade secret information unfairly to compete with Sonoma, to Sonoma's detriment.

92.     On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and to Sonoma's detriment, Sonoma's trade secret information.

**COMPLAINT**

93.     As the direct and proximate result of Defendants' conduct as aforesaid, Sonoma has suffered and, if Defendants' conduct is not stopped, will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

94.     Because Sonoma's remedy at law is inadequate, Sonoma seeks, in addition to damages and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests.

95.     Sonoma's business is reliant on its business reputation and its ability to maintain and grow its customer base in a competitive market.  Sonoma will continue suffering irreparable harm absent injunctive relief.

96.     Sonoma has a substantial likelihood of success on the merits because of Defendants' blatant, willful, and malicious misappropriation of trade secrets through the improper and unlawful methods, as alleged herein.

97.     Sonoma has been damaged by all of the foregoing, and is entitled to its damages, in an amount to be determined at trial, as well as an award of exemplary damages and attorney's fees.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty and Duty of Loyalty

98.     Sonoma incorporates by reference and realleges the allegations in paragraph 1 - 95 as if fully set forth herein.

99.     As CEO, President, Chairman, and Board Member of Sonoma, Defendant Alimi owed Sonoma a duty of undivided loyalty.  Alimi was obliged to act with the utmost good faith, and in the best interests of Sonoma at all times.  That duty continued beyond the termination of Alimi's relationship with Sonoma.

100.    Sonoma was entitled to place its trust and confidence in Defendant Alimi, and to expect Defendant Alimi to act with the utmost good faith toward Sonoma.

101.    Sonoma relied on Defendant Alimi's loyalty and integrity and his faithful performance of his Sonoma duties and responsibilities.

102.    By not performing his duties to Sonoma, by acting in conflict of interest, by engaging in business for his own account to compete with Sonoma, and by misappropriating and misusing

1   Sonoma's trade secrets and confidential information to establish Collidion as a directly competitive

2   enterprise, and by taking affirmative steps to deceive Sonoma and conceal his improper conduct,

3   Defendant Alimi has breached his undivided fiduciary duty of loyalty to Sonoma.

4   103.   Defendant Alimi has, on information and belief, knowingly and willingly breached

5   his duty of loyalty to Sonoma by scheming to deceive and defraud Sonoma, misappropriating and

6   stealing Sonoma's confidential and trade secret information, soliciting Sonoma's existing

7   shareholders to invest in Collidion, and diverting and misappropriating Sonoma's trade secrets,

8   confidential and proprietary business information.

9   104.   Defendant Alimi has, on information and belief, acted in a manner inconsistent with

10   his duty of trust to Sonoma, by soliciting Sonoma's shareholders for his own interest and that of

11   Collidion, and acting for his own and Collidion's interests directly to Sonoma's detriment.

12   105.   As a direct and proximate result of Defendant Alimi's breach of his fiduciary duties

13   towards Sonoma, Sonoma has been and is being harmed.  Sonoma is entitled to damages, in an

14   amount to be determined at trial, as well as disgorgement from Defendant Alimi, and the forfeiture

15   and return of all monies, securities, and ownership derived from Collidion based on

16   misappropriation and misuse of confidential information, and compensation paid to him due to such

17   breach, the exact amount to be determined at trial.  Sonoma is further entitled to injunctive relief

18   against Defendant Alimi, and all those acting in concert or participation with him, remedying their

19   past improper conduct, and preventing such conduct in the future.

20   106.   Defendant Alimi is, on information and belief, still in possession of Sonoma's

21   confidential and trade secret information, and is able to access and use this information on behalf of

22   Defendant Collidion. Further, on information and belief, Defendant Alimi has shared this

23   confidential information with others including vendors and prospective customers who may use, or

24   are using the information to Sonoma's detriment.

25   107.   As a direct and proximate result of Defendant Alimi's disloyalty and breaches of his

26   fiduciary duties, Sonoma has been irreparably injured, and has suffered damages in an amount to be

27   determined at trial.  Because its remedy at law is inadequate, Sonoma seeks, in addition to its

28   damages and permanent injunctive relief, enjoining Defendant Alimi, and all those acting in concert

or participation with him, from further improper conduct, and further remedying their improper

conduct as aforesaid.

## PRAYER FOR RELIEF

WHEREFORE, Sonoma respectfully requests that this Court:

A.  Award damages as described in each of the above claims, in favor of Sonoma and against Defendants in an amount to be proved at trial;

B.  Grant a permanent injunction against Defendants jointly and severally, enjoining each from violating their legal and contractual duties owed to Sonoma, from using Sonoma's confidential, proprietary, and trade secret information and directing the return of all of Sonoma's property;

C.  Award exemplary damages for willful and malicious action on the part of Defendants, the exact amount to be determined at trial;

D.  Awarding Sonoma pre-judgment and post-judgment interest, and its attorneys' fees, costs, and other expenses incurred in this action; and

E.  Granting Sonoma such other and further relief as this Court deems just and proper.

## JURY DEMAND

Sonoma demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated:   March 17, 2017              By:   */s/ Ranjini Acharya*
                                           _____

                                           Michael E Zeliger
                                           Ranjini Acharya
                                           Jerrold F. Petruzzelli
                                           K&L GATES LLP

                                           *Attorneys for Plaintiff, Sonoma Pharmaceuticals,*
                                           *Inc.*